I have a sort of preliminary question that is just from the docketing sheet here. At some point, the docketing sheet shows that there was a stay pending negotiations toward a settlement. And I assume that that must have failed and we're back here? That's correct, Your Honor. Did this case go to our mediation program? There were several phone conversations with Mr. Lee, of course, of your mediation program and we were unable to resolve the matter. Okay. Thank you. Your Honor, in Harmson v. Smith, this Court set out the elements for aiding and abetting liability under the Securities Fraud Statutes. And those are the existence of a primary wrong, actual knowledge by the aider and abetter of the wrong and his or her role in furthering it, and substantial assistance in the wrong. In this case, the SEC has reduced and severely diluted the standard for aiding and abetting liability. And even under that reduced and diluted standard, there's simply not enough evidence in the record to support imposition of the sanctions that were imposed in this case. When the court Maybe you'd better bring me home, then, because we're talking about the July letter to the investors. That's correct, Your Honor. And the July letter to the investors had some wording, which I won't try to recite. You know what it is, relative to the shares of the Lithuanian Bank. That's correct. Then maybe you'd better clear up for me what the record shows as to the exact status of the shares. I can't pronounce her name, the lady that owned the shares that were to be sold to the investors. The record shows that as of the date of the letter, what was in the record that shows the status of those shares, what they knew. Okay. The commission opinion states that Sevey had suspicions. The state of the record is that no one knew anything that the evidence was in conflict. You mean they were blind to the evidence that they were getting or not getting from the seller and from the Lithuanian Bank and from the non-activity? They were blind to all that? They were blind as to what the meaning of the various conflicting pieces of evidence was. There was a series of reports coming back and forth. There were reports from the European Bank of Resources and Development saying that she had 26,000 shares. There were reports saying that she had sold shares. There were reports saying that she had shares. There was a report saying she didn't have shares. But they didn't tell the investors that. They told the investors that there was a problem in getting the shares and they were trying to resolve that problem because they didn't know what happened. This letter was one item of a continuing flow of communication between the investors and Mr. Sevey. Yes, but he's only charged with the declarations or the position stated in that letter. That's correct. Because you've talked about a lot of things, talking to counsel, phone calls night and day, but the point is he the reason that you're here is with regard to the sanctions and what action was taken by the commission that's related to that letter only. Correct. And that letter clearly shows, according to the testimony of the commission's own expert, that the fund doesn't have the shares. And Sevey was working diligently, as the commission recognized, to get to the bottom of the situation to get the shares, to find out what the problem was. After that letter was sent out, there was additional evidence in the record. There's communications with Marzotti, who's on the supervisory counsel of the bank, as Mr. Fuller was on the supervisory counsel of the bank. And two days before the letter was sent out, there's evidence in the record that the letter from Marzotti says, well, this is something the supervisory counsel should be able to work out. I have a problem, because I'll have to go back and reread the record. Tell me how you pronounce the lady's name holding the shares. Kabae. Kabae. Kabae was either the girlfriend or somehow associated with one of the general partners. That's correct. So she was accessible. That's correct. Okay. And yet, with all that accessibility, how much time went from the time that the money was transferred, the $238,000, to the date when the letter was sent out, the July letter? How much time expended? Three months. Okay. And during that three months, they never were able to pin down, even though they paid the money, where the shares were, what the status was, or the status of the registration. Correct. And the record didn't state in the letter to the investors that these shares were being held by the girlfriend of the general partner? That wasn't stated in the letter, either. No, but, Your Honor, that's editorial criticism. I certainly agree, from this point in time, that knowing what we know now, knowing the facts that we know now, looking back, that letter certainly could have included more information. Well, but they valued the CVS, and he was told the value of the shares at market. Yet, and he said there's a problem getting the shares. But if the problem was that they were never going to get the shares, valuing at market is irrelevant at that point. It's highly deceptive, isn't it? No, it's not, because he disclosed the problem in the acquisition. It's not a problem in the valuation. The problem is, were the shares coming? And as the commission's expert testified, the letter disclosed that there were problems getting the shares. And he disclosed that the ‑‑ I think the letter said that the fund had dropped about 4 percent in value, but there wasn't the next step. And if we don't get the shares, we will be down 60 or so percent. I completely agree that that information could have been included, but that wasn't required information that didn't make the letter misleading. This wasn't a period of time where anybody could even invest in the fund. The investors were locked up. Nobody relied upon this. And the investors were in constant communication with CVS, finding out what was going on. So the ‑‑ for these sanctions to be upheld, this Court has to find that sending out that letter was a knowing and willful participation in a fraud. And that's not what the record shows. CV ‑‑ Excuse me. You used the phrase that we have to find. Isn't our standard of review on factual findings for clear error? Your standard of review on factual findings is for clear error, yes. But the factual finding in the commission opinion was that CV only was suspicious. So for this ‑‑ so to uphold the findings of the commission ‑‑ But on whether the letter was misleading, is that a factual conclusion, that it would mislead someone? Whether the letter is misleading or not is different than whether it's fraudulent. If the letter is misleading, the commission would be able to impose liability under 206‑2 because 206‑2 is a passive regulation. Anything viewed from the point of view of the investors, if it could possibly mislead an investor under 206‑2, that kind of conduct can be regulated. That's the type of conduct where you can look back to see, yes, would it have been better if the investors got more information? Under 206‑2, you can regulate those things. Under 206‑1, however, which is required for the imposition of punitive sanctions, which is required for the ‑‑ for the imposition of Tier 2 penalties, the court has to find a willful fraud, which the SEC didn't do because they were confused as the standard of proof. So there are two separate standards of review here. There's the standard of review for the legal standard the SEC applied, which is de novo. There are factual findings, which obviously this Court would have to find clear error. But it's our point that the SEC's factual findings do not support the imposition of sanctions under 206‑1. And I'd like to indicate ‑‑ Can I stop a minute? Because I was trying to track you and trying to think real faster. The aiding and abetting was under section 206, right? It was under ‑‑ it was generically under 206, but the Commission didn't determine whether it was under 206‑1 or 206‑2. There are two subsections. No, but 206 ‑‑ okay, but 206‑2 does not seem to have any scienter involved as to engage in any practice or ‑‑ practice or transaction. Of course, a bidding is what rather than a knowing. That's correct. And what I'm ‑‑ and the standard is clearly lower for 206‑2. However, the sanctions that the Commission imposed were 206‑1 sanctions. The cease and desist order and the level two ‑‑ and the tier two penalty, the financial penalty, those are 206‑1 sanctions. So the Commission wasn't clear in making the distinction between 206‑1 and 206‑2. And that's the difference between sending out a letter where you're sitting down and you're trying to mislead people. That's a violation of 206‑1, and that didn't happen. The Commission found this was only a matter of suspicion. The conclusion of law is, by the Commission, if I'm reading this correctly, it is concluded that C.B. Wilfley aided and abetted Morgan Fuller's violations of sections 206‑1 and 206‑2. Correct. But when if you look at what the Commission decided they had to use for the standard, they talked about a general awareness of the problem. They didn't talk about substantial assistance, and they didn't talk about knowingly, willfully misleading somebody. And that's the standard under ARMSA. But they purposely said that the C.N.R. is not required for 206‑2. They purposely discussed 206‑2. So how am I supposed to read this? You're selecting one section. They did discuss 206‑2, but you said they didn't use that. They discussed 206‑2 only in a footnote, Your Honor. And in 206‑2, they discussed the difference between the ‑‑ No, footnotes are footnotes. I mean, most of our law is in footnotes in the Supreme Court and this Court. I mean, that's a whole different world. You're saying the footnotes should be disregarded? No, I'm not saying they should be disregarded. I'm saying the footnote shows that there's a difference in the standards. But when the Commission put in their statement of the law, they talked about a general awareness. They didn't talk about scienter. And it's very clear the Commission opinion is based upon a general awareness and doesn't require scienter. I'd like to save some time for rebuttal, if I may. You may do so. May it please the Court, my name is Christopher Pack and I represent the Securities and Exchange Commission in this case. I'd first like to respond to the last point that the attorney for appellant made, namely, that the Commission didn't make a finding of scienter. To the contrary, the Commission found specifically that the appellant did not make a finding of scienter. Excuse me one minute. The Commission found specifically that, in fact, C.V. did act with scienter. The language quoted by Judge Brunetti, C.V. willfully aided and abetted and was a cause of the violations. Furthermore, it's undisputed that Mr. C.V. knew at the time he sent out the letter that the fund, in fact, did not have the shares. The misrepresentation here is not merely the fact that the fund didn't have the shares. It was also the effect of the absence of those shares on the balance sheet. Mr. C.V. told the investors we're down 4% for the quarter, when in fact, absent the shares, the fund was down 60 or 70% for the quarter. Now even if Mr. C.V. had fully disclosed the problem, administrative problem as he calls it, with getting these shares, and we of course dispute that he did make that adequate disclosure with that regard, it's the letter still would have been materially misleading because it tells the investors, indeed it gives the misleading investors, even taking into account this administrative problem, the fund is down only 4%. So an investor gets the letter and says, oh, well, there's a problem, but we're still down, we're down, we're down 4%, even taking the problem into account. That essentially is a violation, telling the investors that they're down only 4% when in fact, they're down 60 or 70%. And it's undisputed that the time the letter was sent, the fund didn't have the shares. Even if Mr. C.V. had known to a moral certainty that the fund was going to get the shares in two weeks, four weeks, four months, whenever, he still should have told the investors, look. But in fact, didn't he, he had already concluded around the 1st of July that the shares were never coming, correct? Right. He had concluded around the 1st of July that the fund had been defrauded. In his reply brief, C.V. makes the point that, well, subsequent to my moment of panic, when I wrote an internal memo on July 1, I talked to my boss and he reassured me and said everything was going to be okay. Now, the commission looked at the entire record here and made findings that didn't accept that excuse, essentially, and those findings, of course, are entitled to a great deal of deference. Well, let's stop there just a second. The boss, Fuller, and C.V. are two different people, obviously. Right. C.V.'s a licensed person who has certain statutory obligations as a fiduciary. So even if the boss said, don't worry, I'm going to go steal them, blah, blah, blah, blah, C.V. still had an independent fiduciary duty under the statute, right? That's correct. So that excuse of I talked to the lawyer, I talked to my boss, still doesn't change his fiduciary duty, does it? No, it doesn't. But the point is, whenever the boss, even assuming for the sake of argument that he was entitled to rely on what his boss said, the fact remains that on July 29, when the letter was sent, the fund didn't have the shares, and it was therefore down at least 60 percent. Well, check me if I'm wrong. He, the boss, told him certain things, but he kept telling the boss, maybe I should report this to the authorities. He had already made up his mind that there was a problem, and yet his excuses, but the boss said, don't worry about it. I guess that's where I'm going to that fiduciary thing. There seems to be the fact, if I'm not wrong, that he had made his own determination before the letter that there's a problem, the shares aren't there, there's been a fraud. Then he comes back and says, but the boss told me, don't worry about it. Right. Well, he says later on, I changed my mind. I wrote this memo, internal memo on July 1 saying we've been defrauded. Later on, after further conversations, I changed my mind. The commission looked at the evidence, didn't accept that story. We said, I mean, there may be circumstances under which someone writes X on one day and then 10 days later has a genuine change of mind and decides that Y is the case. And the commission decided that that didn't happen here. That was the commission's finding of fact, essentially, in rejecting Mr. Seiby's defense. And the question about whether someone can sort of rely on things he's told by a superior – it has to be decided on a case-by-case basis. I don't think you can work on hard and fast rules. But how can a person who has a fiduciary duty as a licensed – under the statute, because he could be convicted and he wouldn't – how can he say that my boss told me something? I mean, it might go to the end of the punishment, like this guy was duped, but he still had a fiduciary duty and either violated it and violated 206-2 or 1, or he didn't. Isn't that the way it is? I mean, even if his boss told him that, it doesn't eliminate the violation, does it? It would depend on whether he had a reasonable basis to believe the boss. And the commission found in this case, given all the correspondence he'd been in with the Eastern Europeans, all the attempts he'd made to get this straightened out, and the fact that he kept running into blank walls, in that context, it was – there was no justification whatsoever for his relying on this information, this reassurance from the boss that says, everything's going to be okay, we're going to get this straightened out. I mean, one can imagine a different set of facts where you might come to a different conclusion. And I guess what I'm saying is that this would be – it's a case-by-case thing. I don't think you can – someone who is going to make a representation to investors has a variety of different sources of information. And what I'm saying is that in this case, given all the information that he had, there was – it was – the commission was justified in finding that he wasn't reasonable in the representations that he made. In fact, he acted with scienter when he made these representations to the investors. As I said, one can imagine other circumstances in which maybe someone else would say something that turned out to be untrue, but at the time that that person made the statement, it was reasonable for him to think that it was true. But that's – that's just not the case here. And as I said, the commission considered all these issues and decided that it's not the case. So I guess what I'm saying is that there's – the difference is between a boss telling you, you do X. Of course that's not a defense. If your boss tells you to lie, you have an independent duty not to – I'm confused by your hedging because, as you said, it's a case-by-case basis. If the boss said, I know where the shares are, they're in a safety deposit box, and they're being held by Joe Schmuck, I know Joe Schmuck, and he told me that these people defrauded him, but we're going to get him. I've just talked to the Lithuanian people. If he gave them facts, but if the boss says, don't worry about it, why are we hedging about I'm having a problem with that answer you're giving me. In other words, can I escape my fiduciary duty when I've got all this other information when the boss says, don't worry about it, we'll take care of it? Certainly not. It's certainly not as hard. But what's further evidence of what the boss said? But what I'm saying is, I was suggesting if there weren't all this other evidence putting him on – if there weren't all these red flags popping up all over the place, if these red flags didn't exist – But you're walking right into counsel's argument. He didn't have any intent to deceive. He didn't know about it. You're walking right into his argument, from what I can tell. Well, what I'm saying is, under the facts of this case – well, there are two points. First, under the facts of this case – Let's go back to counsel's argument. Do you think he was convicted and the punishment was inflicted because of a violation of 1 or 2? 206-1 or 206-2? 206-1, intuitively. For aiding and abetting a violation of 206-1. You're telling me that the man didn't have any intent. You're telling me that his boss told him it would be taken care of. Well, the fact of the matter is that there are two issues here. One is whether the fund has the shares. What the chances – one is whether the fund has been defrauded, so it's never going to get the shares. That's one question. A separate question is, on July 29, what does the fund have? It doesn't have the shares. No one is arguing that on the date of the letter, July 29, the fund had the shares. All he's saying is his boss told him, look. He said that. He told the investors. We don't have the shares. We're working on it. But that leads to the further misrepresentation. He tells the investors we don't have the shares, but in a very duplicitous manner. He says we don't have the shares and we're down 4 percent for the quarter, leading an investor to believe that even after the problem, they're down only 4 percent for the quarter, when, in fact, if you take into account this problem, they're down at least 60 percent for the quarter. And that's so there are two misrepresentations here, actually, all very closely related, obviously. One is the misrepresentation as to whether the fund has the shares or not, and we say that this vague disclosure about some unspecified administrative problem when, in fact, the evidence shows that he thought they'd been defrauded. We say that was entirely inadequate. Even assuming for the sake of argument that that disclosure was inadequate, he still lied about the effect of the problem on the fund's balance sheet. If he told the shares, look, we've got this problem, we're down 60 percent for the quarter because of the problem, but we're going to get the problem solved, and then we'll be down only 4 percent, that would have been a different case. But that's not what he did. He said we're down only 4 percent, didn't give an inkling of the huge effect that this problem was going to have on the shareholders. If I could raise go to a different issue very quickly, there is a case that was not cited to this Court in any of the briefs. The case was decided by the D.C. Circuit recently. No 28J letter has been filed with the Court either. I was just about to ask that. Okay. The case is called WHX Corp. v. SEC, and the cite is 362 F3rd 854. This case deals with the issue of the appropriate standard for the commission to issue a cease and desist order. Now, of course, this is a decision of the D.C. Circuit. It's not controlling the decisions, not controlling in this circuit. I would further say that even if you decided that this case was well-reasoned, it is quite distinct from the incident case. This case involved a situation where a corporation wanted to make a conditional tender offer, and the commission said it couldn't impose that condition on its tender offer. And the company eventually, quote, withdrew the offending position once the commission had made its official position clear. That's page 861. So you have a situation where, in the words of the D.C. Circuit Court of Appeals, you have a single isolated instance, and the offender is saying, okay, I get it. I'm not going to do it. Or I'm not. They never did it in the first place, but he's saying I'm not going to do it in the future. And so the D.C. Circuit said under that circumstance, there's no risk of further violation. The C&D is not justified. In contrast, in this case, you have a finding by the commission that there is a risk of future violation, because in the words of the commission, and this is at page 6 and 7 of the commission's decision, C.B.'s arguments to us demonstrate a lack of appreciation for his responsibility as an associated person of an investment advisor. And farther down on page 7, the commission says we've considered the general factors relevant to any imposition of sanctions described above, including this factor. So in the WHX case, you have a situation where the offender says, okay, I get it. I'm not going to do it in the future. In contrast, here you have Mr. C.B. saying, continuing to argue to the commission, look, I don't think I did anything wrong. And when someone says that, I think the commission is justified in drawing the inference that there is a risk of a future violation, because the person doesn't acknowledge that he did anything wrong, thinks his conduct was perfectly fine. Let's start contrasting the WHX case. And under those circumstances, the commission is justified in finding that there is a risk of a future violation and issuing a C.D. C and D. That, of course, is in marked contrast to the standard the commission needs to meet for an injunction and, of course, a likelihood of future violation. And we're not seeking an injunction here, and C and D is very different from an injunction. I wanted to bring that case to the Court's attention, because I'm sure the Court will become aware of it. Finally, I'd like to conclude by saying that the commission did use the correct standard knowledge. In articulating the standard, it said that C.B. must have, quote, a general awareness of or knew that his actions were part of an overall activity that was improper. So the commission was using the phrase general awareness as a synonym for a general  It was using it as a synonym for the word knew, and, in fact, that is consistent with the way these phrases have been used in the cases, as is discussed in our brief. The commission found that C.B. had actual knowledge that the representation as to the fund's assets on July 29 was not true. C.B. says he didn't know it was false when it was sent. Well, he did know that the representation as to the assets the funds had at that date was false. Furthermore, C.B. knew that there was a substantial chance that the fund would never get those shares. He knew that the funds, A, the funds had been sold elsewhere. B, the issuer of the shares, the bank, was refusing to cooperate with the fund. I think it's really disingenuous in light of these circumstances to argue that he was not merely suspicious. He had, in fact, written an internal memo saying, look, the fund has been defrauded. The commission looked at the totality of circumstances here, all of the various sources of information, and concluded that C.B. was utterly unjustified under the circumstances in including the value of those shares when he calculated the fund's assets. If the Court has no further questions. I think we don't. Thank you. Thank you very much. Mr. Cannon, you have some rebuttal time remaining. Thank you, Your Honor. Your Honor, it's very clear that this was not a memo that was presented to the fund. This was a draft memorandum that was put together as persuasively as possible so that C.B. could make known what his concerns were. He made those concerns known to his lawyer. He made them known to fund management. He had a conversation with fund management, and fund management gave him specific reasons as to why his suspicions were overblown. Specifically, Fuller told him, one, that he was on the management council of ABBH, and he would be able to get the shares back. Two, Fuller told him that problems like this are not unanticipated in Eastern Europe. He's had them in the past, and he's been able to solve them. Three, he had communications with Marzanotti. Marzanotti told him that this was something that should be dealt with in a collegial manner among the management of ABBH, and they would be able to resolve it. He did not put that draft memo into final form. And even more importantly, as the court was asking questions before about the standard of review, the commission keeps arguing that in the opinion of the commission, the commission found that C.B. knew. The opinion of the commission did not find that C.B. knew that he didn't have the shares. The commission only found that C.B. was suspicious. It's clear that he was suspicious, and he was acting to run those suspicions to ground to get the shares. The commission recognized that he was diligent. When you were talking about draft memo, are you talking about the July 1? The July 1 memo was a draft memo, and it's so important to the commission that they've included seven different versions of that same memo in the supplemental excerpt of the record. They're unsatisfied with the one version that we provided to the court. C.B. was never presented to anyone. C.B. admitted he prepared it. He admitted he discussed it. He was trying to make a case, and he was convinced by his conversation with management that his case wasn't good. He wasn't convinced that those shares were gone until there was a confrontation with Cabay, and Cabay finally admitted it in late September that she had sold the shares. In the meantime, there was communication with Cabay. There was communication with Cabay's boyfriend, who was one of the managers of the funds, and Lushtak was a very persuasive person. C.B. talked to him directly. He said the shares were going to be turned over. This was a state of uncertain information. C.B. was suspicious. He was rightfully suspicious, but he didn't know the extent of the problem until late September. That's very clear from the evidence. That's very clear from what the commission found. In addition, when you look at the commission order, Mr. Paik just argued that the commission found that C.B. willfully aided and abetted and was the cause of Morgan Fuller's violations. The commission did, in fact, say that. But when you look at how the commission defined it, they say that C.B. had a general awareness of or knew that his actions were part of an overall activity that was improper. They're not saying that he had to know, he only had to have a general awareness. They specifically found only that he was suspicious. To use the appropriate standard, which this court has decided that C.B. has to participate, has to know, has to know that he's misleading people, that's what this court has defined. The commission didn't find that. The commission imposed the wrong level of sanctions based upon a wrong level of scientific rating and abetting liability. There are no questions. I'll sit down. Thank you, counsel. Thank you.
judges: Hall, Brunetti, Fisher